## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WATERKEEPER ALLIANCE, INC.; WATERKEEPERS CHESAPEAKE, INC.; and CALIFORNIA COASTKEEPER d/b/a CALIFORNIA COASTKEEPER ALLIANCE,<br><br>     Plaintiffs,<br><br>  v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and ANDREW WHEELER, in his official capacity as Acting Administrator of the United States Environmental Protection Agency,<br><br>     Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Reed W. Super
Michael DiGiulio
SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038
T: (212) 242-2355
F: (855) 242-7956
reed@superlawgroup.com
mike@superlawgroup.com

*Attorneys for Plaintiffs*

Table of Contents

I.      Introduction ................................................................................................ 1

II.     Jurisdiction and Venue ............................................................................... 2

III.    Parties ........................................................................................................ 2

IV.     Statutory and Regulatory Background ........................................................ 8

V.      Factual Allegations .................................................................................... 13

        Review and Revision ...................................................................... 13

            Tetrachloroethylene, Trichloroethylene, Chlorite,
            Cryptosporidium, Haloacetic Acids, Heterotrophic Bacteria,
            Giardia Lamblia, Legionella, Total Trihalomethanes, and Viruses........ 13

            Hexavalent Chromium ............................................................. 16

        Regulatory Determinations ............................................................ 21

        Contaminant Candidate Lists ........................................................ 22

VI.     Causes of Action........................................................................................ 24

            FIRST CAUSE OF ACTION
            Failure to Perform Nondiscretionary Duties
            Review and Revision of Existing NPDWRs........................................ 24

            SECOND CAUSE OF ACTION
            Failure to Perform Nondiscretionary Duties
            Review and Revision of Existing NPDWRs........................................ 27

            THIRD CAUSE OF ACTION
            Failure to Perform Nondiscretionary Duties
            Review and Revision of Existing NPDWRs........................................ 29

            FOURTH CAUSE OF ACTION
            Judicial Review of Agency Action...................................................... 30

            FIFTH CAUSE OF ACTION
            Failure to Perform Nondiscretionary Duties
            Determinations to Regulate Previously Unregulated Contaminants.................... 31

            SIXTH CAUSE OF ACTION
            Failure to Perform Nondiscretionary Duties
            Publication of Contaminant Candidate List........................................ 33
            .
            SEVENTH CAUSE OF ACTION
            Declaratory Judgment........................................................................ 34

            EIGHTH CAUSE OF ACTION
            Unreasonable Delay............................................................................ 36

VII.    Prayer for Relief ........................................................................................ 38

<u>Acronyms and Abbreviations</u>

| | |
|---|---|
| Cr-6 | Chromium-6, also known as Hexavalent Chromium |
| EPA | United States Environmental Protection Agency |
| IRIS | EPA's Integrated Risk Information System |
| MCL | Maximum Contaminant Level |
| MCLG | Maximum Contaminant Level Goal |
| NPDWR | National Primary Drinking Water Regulation |
| NTP | National Toxicology Program of the United States Department of Health and Human Services |
| PFAS | Per- and polyfluoroalkyl substances, including PFOA (perfluorooctanoic acid) and PFOS (perfluorooctane sulfonate) |
| PPB | Parts Per Billion |
| SDWA | Safe Drinking Water Act |

# I.

## INTRODUCTION

1.     The Safe Drinking Water Act ("SDWA" or the "Act") is the principal federal law for protecting the safety and quality of drinking water in the United States.

2.     The Act is administered by the United States Environmental Protection Agency ("EPA") and applies to more than 150,000 publicly- and privately-owned water systems that provide tap water to approximately 90 percent of homes nationwide and to virtually all Americans at some time in their lives.

3.     Congress overhauled the Act in 1996 after an outbreak of waterborne disease resulted in 104 deaths and more than 400,000 illnesses in 1993.

4.     As amended in 1996, the SDWA requires, *inter alia*, EPA to identify contaminants present in drinking water, to set regulatory limits for the amounts of certain contaminants permitted in drinking water, and to review and revise the existing drinking water regulations in order to maintain or provide for greater protection of the health of persons.

5.     The Act requires EPA to take those actions in accordance with mandatory deadlines set forth in the statute.

6.     Unfortunately, over the last two decades EPA has been perpetually behind schedule in virtually all phases of the SDWA's regulatory process and has missed numerous deadlines, often by years.

7.     EPA is presently in violation of many of the Act's mandatory requirements.

8.     With unsafe drinking water causing health crises in numerous locales across the country, EPA's delays and inaction with respect to regulating the quality of the nation's drinking water puts the public at unnecessary and unacceptable risk.

1

9.     Waterkeeper Alliance, Waterkeepers Chesapeake, and California Coastkeeper Alliance bring this case to compel EPA to perform nondiscretionary duties under the Act, to review determinations made by EPA, and to compel action unlawfully withheld and unreasonably delayed.

## II.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to federal question jurisdiction, 28 U.S.C. § 1331, the Administrative Procedure Act ("APA"), and the citizen suit provision of the Safe Drinking Water Act, 42 U.S.C. § 300j-8(a)(2).

11.     This Court has authority to issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201-2202.

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Waterkeeper Alliance resides in this judicial district.

13.     By letter dated November 15, 2018, Plaintiffs provided Defendants with written notice, pursuant to 42 U.S.C. § 300j-8(b)(2), of their intent to sue to compel nondiscretionary duties that Defendants have failed to perform.  More than sixty days have passed since the notice of intent to sue was served on Defendants.  A copy of the notice letter is attached as Exhibit A.

## III.

## PARTIES

14.     Plaintiff Waterkeeper Alliance, Inc. is a not-for-profit corporation organized under the laws of the State of New York which unites more than 300 Waterkeeper organizations and affiliates around the world and contributes to and focuses them on citizen advocacy. Waterkeeper Alliance's headquarters is located in Manhattan.  The organizational goal of

Waterkeeper Alliance is to achieve drinkable, fishable, and swimmable water everywhere. Waterkeeper Alliance supports and connects Waterkeeper organizations and provides a voice for waterways and their communities worldwide. Waterkeeper Alliance conducts advocacy and litigation on issues common to Waterkeeper programs and member organizations. Waterkeeper Alliance has more than 12,000 individual supporting members. Waterkeeper Alliance also has approximately 340 organizational members – Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Deltakeepers, Gulfkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, Streamkeepers, and Waterkeepers chartered and licensed by Waterkeeper Alliance. These organizational members themselves have individual members. Waterkeeper Alliance's individual members and the members of Waterkeeper's organizational members reside in communities across the country (and abroad) and regularly drink water from public water systems that are regulated under the SDWA.

15.     Plaintiff Waterkeepers Chesapeake, Inc. is a not-for-profit corporation organized under the laws of the State of Maryland. Waterkeepers Chesapeake is a coalition of 18 independent Waterkeeper organizations working for clean water in and around Chesapeake Bay. Waterkeepers Chesapeake's mission is to make the waters in the Chesapeake Bay watershed swimmable, fishable, and drinkable. Waterkeepers Chesapeake is a licensed regional entity and an organizational member of Waterkeeper Alliance. Waterkeepers Chesapeake has 18 organizational members and many individual contributors. Its organizational Waterkeeper members use grassroots action and advocacy to protect their respective communities and waters. These organizational members also have individual members. Waterkeepers Chesapeake's board members and contributors and the members of Waterkeeper Chesapeake's member organizations live, work, and recreate in and around the Chesapeake Bay watershed and

3

regularly consume drinking water from public water systems that are regulated under the SDWA.

16.     Plaintiff California Coastkeeper d/b/a California Coastkeeper Alliance ("CCKA") is a not-for-profit corporation organized under the laws of the State of California.  CCKA's mission is to make the waters of California swimmable, fishable, and drinkable.  CCKA is a licensed regional entity and an organizational member of Waterkeeper Alliance.  CCKA uses law, policy, science, and creative media to advocate for policy and programs that promote healthy and clean waters throughout the state of California.  CCKA has 10 organizational members and many individual contributors.  The organizational Waterkeeper members also have individual members.  CCKA, along with its organizational Waterkeeper members, provide the public with the tools and information needed to hold decision-makers accountable and to be effective local water stewards.  CCKA's board members and contributors and the members of CCKA's member organizations live, work, and recreate throughout California and regularly consume drinking water from public water systems that are regulated under the SDWA.

17.     Plaintiffs bring this action on behalf of themselves, their organizational members, and their individual members.  Plaintiffs' memberships include individuals and families who drink, cook with, wash with, and otherwise consume and use water from public drinking water systems that are regulated under the SDWA.  Plaintiffs' members and their children ingest water from public drinking water systems on a daily basis at home, at school, at work, at restaurants, and at other locations.  Plaintiffs' members live, work, and recreate in communities served by public water systems regulated under the SDWA.  It is impossible for Plaintiffs' members to avoid ingesting water or contaminants from these public drinking water systems and it would be highly burdensome and extremely costly for them to attempt to eliminate their consumption of contaminants in that water.

18.     EPA's failure to implement the SDWA as envisioned by Congress – by reviewing and revising drinking water regulations, and identifying and regulating contaminants of emerging concern, within statutorily-mandated time frames – threatens water quality, water safety, and human health, and puts Plaintiffs' members and millions of others at substantial risk of harm. For example, Plaintiffs' members and their children and other family members regularly ingest contaminants from public drinking water systems.  Some of these contaminants are present in their drinking water at levels that are higher than they would be if EPA fully complied with the SDWA duties and other legal requirements that Plaintiffs seek to enforce in this case.  With respect to contaminants of emerging concern (often referred to as "emerging contaminants") or other currently unregulated contaminants, the absence of regulation means that public water systems can supply water to Plaintiffs' members with unlimited levels of those contaminants, thereby adversely affecting the health of those members and their families.  In fact, as a result of EPA's failures to comply with the law, the presence or amount of those contaminants may remain completely unknown to the public, federal and state regulators, and the public water systems, contrary to the SDWA's purpose and goal to identify, monitor, and regulate currently unregulated contaminants.

19.     With respect to currently regulated contaminants, as a result of EPA's failures to comply with the law, Plaintiffs' members are consuming water from public systems that contains contaminants at levels that are higher than they would be if EPA revised the regulations to lower the maximum contaminant levels or otherwise strengthened the regulation.  In some instances, Plaintiffs' members' water contains regulated contaminants at levels that are higher than the maximum health level goals or other health guidelines and lower than the legal limits.  The health risks to Plaintiffs' members would be reduced if EPA reduced the maximum contaminant

levels to match or be closer to the health-based goals or otherwise strengthened the regulations.

20.     EPA's failures to properly regulate certain contaminants causes broader harms to the general public and to Plaintiffs' members.  For example, health risks can be increased and magnified, often in unknown ways, by the simultaneous consumption of multiple drinking water contaminants.  Health studies are typically conducted without assessing these combined effects. Thus, exposure to one contaminant at certain levels can create not only the health risks associated with that contaminant, but also health risks associated with other contaminants consumed simultaneously.  Likewise, a reduction in the levels of one contaminant in drinking water can reduce the health risks associated with other contaminants being consumed simultaneously.

21.     Plaintiffs and their members are also harmed by their inability to obtain information about the levels of emerging contaminants and other contaminants that are currently present in their drinking water.  Such information would otherwise be collected and made available to the public but for EPA's systematic failures to implement the SDWA.  For example, once a contaminant is regulated, the contaminant is regularly monitored in drinking water and that monitoring information is made public.  Further, inclusion of a contaminant on the contaminant candidate list or in the unregulated contaminant monitoring rule also leads to the collection and dissemination of information regarding contaminants in drinking water.  Had Defendants timely implemented the SDWA, Plaintiffs and their members would have access to greater information about various contaminant levels, including emerging contaminant levels, in their drinking water sources and the associated health risks.  If Plaintiffs and their members had access to this information, they could make informed decisions about potential health risks and take steps to protect their families' health when contamination occurs and to reduce the levels of

these contaminants in drinking water and in the environment more broadly. Defendants' failures to comply with the Act have deprived Plaintiffs' and their members of information to which they are entitled.

22. Once a contaminant is regulated under the SDWA, the contaminant must be included in state source water assessments prepared by pursuant to 42 U.S.C. § 300j-13. Among other things, these assessments must delineate the boundaries from which public water systems receive supplies of drinking water and identify the origins of contaminants to determine the susceptibility of the public water systems to such contaminants. These source water assessments must be made available to the public. By identifying the origin of contaminants, source water assessments and other programs in the SDWA and related laws support government and private efforts at pollution prevention and protecting water resources that can supply drinking water from becoming polluted in the first place. The Defendants' failures to implement the SDWA not only deprives Plaintiffs and their members of information regarding the origin of pollutants but also harms their ability to identify sources of pollution in the environment and to pursue the reduction or remediation of such pollution. Such pollution prevention activities are part of Plaintiffs' mission and are one reason that their members join the organizations.

23. Once a contaminant is subject to a maximum contaminant level, violations of those legal limits by public water systems can be enforced by the government, or in the absence of government enforcement, by citizens or organizations like Plaintiffs under the Act's citizen suit ("citizen's civil action") provision, 42 U.S.C. § 300j-8(a)(1). By not regulating contaminants, and not strengthening existing regulations, as required by the SDWA, EPA frustrates and prevents the enforcement of the Act, whether by government regulators or by citizens, including Plaintiffs, in citizens' suits.

24.     Once a contaminant is regulated under the SDWA, EPA's regulation for that contaminant must also contain other provisions relating to quality control, testing, operation and maintenance, the minimum quality of water taken in to the system, and the siting of water systems.  EPA's failures to comply with the SDWA also deprive Plaintiffs and their members of the benefits of such regulatory provisions and of the ability to participate in the rulemaking process that would establish these requirements.

25.     The relief sought in this suit would require Defendants to comply with their statutory obligations and take actions that have been unreasonably delayed and would redress the harms to Plaintiffs and Plaintiffs' members.

26.     Defendant United States Environmental Protection Agency, a federal agency of the United States, is responsible for the implementation and administration of the relevant provisions of the Safe Drinking Water Act.

27.     Defendant Andrew Wheeler is the Acting Administrator of the Environmental Protection Agency.  The SDWA requires certain actions to be taken by the Administrator of the United States Environmental Protection Agency.  Plaintiffs bring this action against Mr. Wheeler in his official capacity.

## IV

## STATUTORY AND REGULATORY BACKGROUND

28.     Congress enacted the Safe Drinking Water Act (Pub. L. No. 93-523) in 1974 to ensure that public drinking water is safe.

29.     The Act is codified, as amended, at 42 U.S.C. §§ 300f to 300j-26.

30.     The cornerstone of the Act is the national primary drinking water regulations, ("NPDWRs").

31.    NPDWRs apply to "public water systems" which are defined in the Act as "system[s] for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." 42 U.S.C. § 300f(4)(A). Public water systems may be owned publicly or privately.

32.    Approximately 90 percent of homes in the United States receive drinking water from public water systems, and virtually all Americans consume water provided by a public water system, whether at home, at school, at work, in restaurants, or in other locations.

33.    NPDWRs establish maximum contaminant levels ("MCLs") for contaminants which may have an adverse effect on the health of persons. 42 U.S.C. §§ 300f(1)(B), 300g-1.

34.    An MCL is an enforceable legal limit and is defined in the Act as the "maximum permissible level of a contaminant in water which is delivered to any user of a public water system." 42 U.S.C. § 300f(3).

35.    Contaminants are defined as any physical, chemical, biological, or radiological substance or matter in water. 42 U.S.C. § 300f(6).

36.    For each contaminant regulated by an NPDWR, the Act also requires EPA to propose and publish a maximum contaminant level goal ("MCLG"). 42 U.S.C. § 300g-1.

37.    MCLGs must be set at the level at which no known or anticipated adverse effects on the health of persons occur, allowing an adequate margin of safety. 42 U.S.C. § 300g-1(b)(4)(A).

38.    Subject to certain exceptions, the Act requires EPA to set MCLs at a level that "is as close to the [MCLG] as is feasible." 42 U.S.C. § 300g-1(4)(B).

39.    NPDWRs must also contain criteria and procedures to assure a supply of drinking

9

water which dependably complies with the MCLs, including quality control and testing procedures to insure compliance with such levels and proper operation and maintenance of public water systems, as well as requirements for the minimum quality of water which may be taken into a system and for the siting of new public water system facilities.  42 U.S.C. § 300f(1)(D).

40.     Unfortunately, EPA has moved at a very slow pace in implementing this crucially important legislation.

41.     From 1974 until 1986, EPA regulated just one additional contaminant beyond the 22 standards previously developed by the United States Public Health Service.

42.     Frustrated with EPA's inaction, Congress amended the Act in 1986, requiring the agency to regulate 85 specified contaminants within three years.

43.     In the ensuing decade, from 1986 to 1996, EPA established limits on more than 80 new contaminants.

44.     In 1993 a massive outbreak of cryptosporidium infection was transmitted through the public water supply in Milwaukee, sickening more than 400,000 people and killing more than 100 people.

45.     Although EPA had developed a research plan to improve understanding of cryptosporidiosis more than a decade before the Milwaukee outbreak, cryptosporidium remained unregulated in 1993.

46.     In the wake of that crisis, in 1996 Congress passed bipartisan legislation that made sweeping amendments to the SDWA.

47.     As amended in 1996, the Act requires EPA to take the following actions and then to repeat each of them every five years: (i) publish a list of unregulated contaminants to be

monitored by public water systems; (ii) publish a list of previously unregulated contaminants that are candidates for regulation; (iii) determine whether at least five unregulated contaminants should be regulated.

48.     Those EPA actions are subject to mandatory statutory deadlines, each of which is tied to the enactment date of the 1996 SDWA amendments, which was August 6, 1996.

49.     Once EPA determines to regulate an unregulated contaminant, the Act sets deadlines for EPA's proposal and promulgation of a national primary drinking water regulation for the specified contaminant.

50.     The SDWA also requires EPA, every six years, to review, and if appropriate, revise the national primary drinking water regulations.

51.     As alleged below, EPA has not timely complied with these requirements and deadlines and has not safeguarded public drinking water as Congress intended.

52.     Since 1996 EPA has decided to regulate only one previously unregulated drinking water contaminant (perchlorate).  EPA then missed the statutory deadline for proposing and promulgating an NPDWR for perchlorate and was sued for that failure in this Court.  *Natural Resources Defense Council v. U.S. EPA*, No. 16-cv-1251(ER) (S.D.N.Y.).

53.     Further, since 1996 EPA's reviews of existing NPDWRs have resulted in the revision of only one existing regulation (the Total Coliform Rule).

54.     Approximately 90 drinking water contaminants are presently regulated through NPDWRs.

55.     There are, however, thousands of drinking water contaminants that remain unregulated, many of which may have significant adverse effects on the health of persons.

56.     For example, there is presently no NPDWR for "PFOA" or "PFOS," which

11

belong to a larger group of chemicals called per- and polyfluoroalkyl substances ("PFASs"), which are known to be extremely toxic, are linked to kidney and thyroid disease, may cause cancer, and have been found in drinking water supplies for at least 16 million people in 33 states.

57.     Although EPA finally announced in May 2018 that it would "initiate steps to evaluate the need" for a maximum contaminant level for PFOA and PFOS (EPA Press Release dated 5/22/18), this came many years after EPA was alerted to PFOA pollution of tap water in the Ohio Valley in 2001, in two Alabama counties in 2009, in Hoosick Falls and Newburgh, New York, in various towns in Michigan, and in many other places across the country.

58.     Just eight months later, in January 2019, Acting Administrator Wheeler was reported to have signed off on a decision to not regulate PFOA and PFOS under the SDWA.  In contrast to the extensive delays in EPA's regulation of drinking water contaminants, the agency acted expeditiously in deciding not to regulate these highly toxic and widespread contaminants under the Act.

59.     In addition to emerging contaminants like PFOA/PFOS, more familiar drinking water contaminants, such as lead, also continue to threaten human health, as the recent crisis in Flint, Michigan, and a similar one in Newark, New Jersey, have demonstrated.

60.     In 2009, the New York Times reported that "not one chemical has been added to the list of those regulated by the Safe Drinking Water Act since 2000," and that although "recent studies have found that even some chemicals regulated by that law pose risks at much smaller concentrations than previously known …, many of the act's standards for those chemicals have not been updated since the 1980s, and some remain essentially unchanged since the law was passed in 1974."  Charles Duhigg, *That Tap Water Is Legal but May Be Unhealthy*, N.Y. Times, Dec. 16, 2009.

61.     Almost a decade later, the situation remains unchanged.

## V.

## FACTUAL ALLEGATIONS

### Review and Revision

**Tetrachloroethylene, Trichloroethylene, Chlorite, Cryptosporidium, Haloacetic Acids, Heterotrophic Bacteria, Giardia Lamblia, Legionella, Total Trihalomethanes, and Viruses**

62.     The Act provides that EPA shall, not less often than every 6 years, review and revise, as appropriate, each national primary drinking water regulation.

63.     On July 18, 2003, EPA published its Six-Year Review 1, in which the agency determined that 68 NPDWRs did not need to be revised and one NPDWR (the Total Coliform Rule) should be revised.  68 Fed. Reg. 42907 (July 18, 2003).

64.     It took EPA nearly ten more years to actually revise the Total Coliform Rule, which it did on February 13, 2013.  78 Fed. Reg. 10269 (Feb. 13, 2013).

65.     In Six-Year Review 2, EPA made at least two significant changes to its review process.

66.     First, instead of publishing a preliminary determination as to which regulations should be revised, taking public comment, and then finalizing the decision (as EPA had done in Six-Year Review 1), the agency announced the completion of Six-Year Review 2, published the results, and then accepted public comment.

67.     Second, instead of stating that it was appropriate to revise one or more NPDWRs, *i.e.*, that those NPDWRs "should be revised" (as EPA had done in Six-Year Review 1), EPA changed its terminology and instead stated that certain NPDWRs "are candidates for regulatory revision."

68.     On March 29, 2010, EPA published its Six-Year Review 2, in which the agency

determined that four NPDWRs – tetrachloroethylene, trichloroethylene, acrylamide, and epichlorohydrin – "are candidates for regulatory revision." 75 Fed. Reg. 15499 (Mar. 29, 2010).

69.     On January 11, 2017, EPA published its Six-Year Review 3, in which the agency determined that the following eight NPDWRs are "candidates for regulatory revision": (1) chlorite, (2) cryptosporidium, (3) haloacetic acids, (4) heterotrophic bacteria, (5) giardia lamblia, (6) legionella, (7) total trihalomethanes, and (8) viruses. 82 Fed. Reg. 3518 (Jan. 11, 2017).

70.     In Six-Year Review 3, EPA determined that the NPDWRs for acrylamide and epichlorohydrin are no longer "candidates for revision" due to, among other things, "limited potential health benefits" the agency expects to result from revision of those NPDWRs. 85 Fed. Reg. at 3526.

71.     Tetrachloroethylene, also known as perchloroethylene and abbreviated as PERC or PCE, is primarily used as dry-cleaning fluid and for degreasing metals. Health effects from consumption in drinking water include liver problems and increased risk of cancer. The MCLG is zero; the MCL is 5 parts per billion ("ppb").

72.     Trichloroethylene is used for degreasing metals and is commonly found at industrial factories. Health effects from consumption in drinking water include liver problems and increased risk of cancer. The MCLG is zero; the MCL is 5 ppb.

73.     Chlorite appears in drinking water sources because it is a byproduct of the disinfectants used to treat drinking water. Health effects from consumption in drinking water include anemia, and nervous system damage in infants, young children, and fetuses in pregnant woman. The MCLG is 800 ppb; the MCL is 1,000 ppb.

74.     Cryptosporidium appears in human and animal waste. Short term exposure leads to gastrointestinal illness (e.g., diarrhea, vomiting, cramps). The MCLG is zero; the MCL is

14

99% removal for filtered systems and a comprehensive runoff plan for unfiltered systems.

75.     Haloacetic acids appear in drinking water sources because it is a byproduct of the disinfectants used to treat drinking water.  Health effects from consumption of haolacetic acids in drinking water include an increased risk of cancer.  The MCLG for certain haloacetic acids is zero; the MCL is 60 ppb.

76.     Heterotrophic bacteria naturally occur in the environment.  Heterotrophic bacteria are used as proxies for how well the drinking water system is maintained; the lower the concertation of bacteria in drinking water, the better the system is maintained.  There is no MCLG; the MCL is no more than 500 bacterial colonies per milliliter.

77.     Giardia lamblia appears in human and animal waste.  Short term exposure leads to gastrointestinal illness (e.g., diarrhea, vomiting, cramps).  The MCLG is zero; the MCL is 99.9% removal/inactivation.

78.     Legionella appears naturally in water and multiplies in heating systems.  Legionella may cause Legionnaire's Disease, which is a type of pneumonia.  The MCLG is zero; there is no MCL; however, EPA has stated that the same techniques used to remove/deactivate giardia and viruses from drinking water sources adequately controls legionella.

79.     Trihalomethanes appear in drinking water sources because they are a byproduct of the disinfectants used to treat drinking water.  Health effects from consumption in drinking water include liver, kidney, or central nervous system problems and an increased risk of cancer.  The MCLG for certain trihalomethanes is zero; the MCL is 80 ppb.

80.     Viruses appear in human and animal waste.  Short term exposure leads to gastrointestinal illness (e.g., diarrhea, vomiting, cramps).  The MCLG is zero; the MCL is 99.9% removal/inactivation.

81.     EPA has not revised any of the NPDWRs that the agency identified for regulatory revision in Six-Year Review 2 or Six-Year Review 3.

82.     The NPDWRs for all of those contaminants remain the same as they were when first promulgated; the health benefits that could have and should have been achieved from their revision have not been achieved; and millions of Americans are consuming drinking water that is less safe than it would be if the MCLs were lowered or other improvements to the regulations were made.

## Hexavalent Chromium

83.     Hexavalent Chromium, also known as chromium-6 or Cr-6, is a highly toxic form of chromium which is perhaps best known for its role in the 2000 film *Erin Brockovich* and the contamination of Hinkley, California's drinking water.

84.     The MCL for total chromium is 100 parts per billion.  40 C.F.R. § 141.62(b).

85.     The MCLG for total chromium is also 100 parts per billion.  40 C.F.R. § 141.51(b).

86.     EPA established this limit and this goal in 1991.  56 Fed. Reg. 3526 (Jan. 30, 1991).

87.     EPA established the MCL and MCLG for chromium based on the belief that exposure to chromium-6 could result in allergic dermatitis (skin reactions) but was not carcinogenic.

88.     The most common forms of chromium that occur in waters in the environment are trivalent chromium (chromium-3) and hexavalent chromium (chromium-6).

89.     Chromium-6 is the more toxic form of chromium.  56 Fed. Reg. at 3537.

90.     Chromium-6 and chromium-3 are covered under a total chromium NPDWR

because these forms of chromium can convert back and forth in water and in the human body, depending on environmental conditions.

91.     Chromium-6 is known to cause cancer when inhaled.

92.     In 1998 EPA revised its risk assessment for chromium through oral exposure in light of "relevant studies . . . on the toxicity of chromium including of potential developmental and reproductive toxicity."  67 Fed. Reg. 19030, 19057 (Apr. 17, 2002).

93.     The U.S. Department of Health and Human Services' National Toxicology Program ("NTP") then agreed to study the chronic toxicity and carcinogenicity of chromium-6 through oral exposure.

94.     In 2002, EPA reviewed the existing NPDWR for chromium during its Six-Year Review 1 and "identified changes in the health risk assessment that support consideration of whether it may be appropriate to revise the MCLG and MCL."  67 Fed. Reg. at 19057.

95.     However, EPA stated that it would await completion of the National Toxicology Program study before deciding whether the chromium regulation should be revised.

96.     In particular, EPA stated that: "the Agency believes that a decision to revise the chromium NPDWR at this time is premature in light of the ongoing NTP studies on the toxicology and carcinogenicity of hexavalent chromium. . . .   Because the NTP studies will not be available in time for the final revise/not revise decision, EPA is placing chromium in the 'not revise–data gap' category.  When completed, the NTP results will be considered either in the next review round or sooner. . . ."  67 Fed. Reg. at 19060.

97.     In 2007, EPA nominated and included Cr-6 on its 2008 Integrated Risk Information System ("IRIS") agenda for a revised health assessment to be completed.  72 Fed. Reg. 72715 (Dec. 21, 2007).

98.     The National Toxicity Program completed its study in July 2008 and concluded that chromium-6, which "has already been shown to cause cancer when inhaled in the air," causes oral cancers in rats and cancer of the small intestine in mice when ingested in drinking water.  National Toxicology Program, *Technical Report on the Toxicology and Carcinogenesis Studies of Sodium Dichromate Dihydrate* (Cas No. 7789-12-0) (Drinking Water Studies) (July 2008) at 5.

99.     Based in part on the NTP study, the State of California established a public health goal of 0.02 parts per billion for hexavalent chromium, which is 5,000 times lower than the federal MCLG and MCL.

100.     As a result of the NTP study, EPA stated that the hexavalent chromium data on cancer "could have an effect" on the maximum contaminant level goal.  EPA, Six-Year Review 2 Health Effects Assessment: Summary Report, Office of Water (4304T) EPA 822-R-09-006, October 2009, at 23.

101.     In 2010, in its Six-Year Review 2, EPA stated that the 2008 NTP study "found clear evidence of carcinogenic activity" in animals and noted that analyses of human exposure to hexavalent chromium "further support a statistically significant increase in stomach cancer."  75 Fed. Reg. at 15530.

102.     EPA also stated that the 2008 NTP study "observed noncancer effects" including "histiocytic cellular infiltration in the liver, small intestine, and pancreatic and mesenteric lymph nodes of rats and mice, and diffuse epithelial hyperplasia in the small intestine of male and female mice."  75 Fed. Reg. at 15530.

103.     However, EPA again decided that the existing NPDWR for chromium was not appropriate for revision "at this time" because a health assessment was "in process," specifically

18

EPA's IRIS health assessment for chromium-6 that the agency had initiated in 2007 or 2008.  75 Fed. Reg. at 15530.

104.    Nearly seven years later, in its Six-Year Review 3, published on January 11, 2017, with the 2008 IRIS assessment still "in process" nine years after it had been initiated, EPA listed the existing NPDWR for chromium in the category of "not appropriate for revision at this time."  82 Fed. Reg. at 3525-3527.

105.    Moreover, EPA failed to perform the statutorily-mandated review of the existing NPDWR for chromium required by the Act during its Six-Year Review 3.

106.    Instead, EPA simply deferred the review and the revise/not revise decision to a future review cycle.

107.    Thus, in all three of its six-year reviews (in 2003, 2010, and 2017) EPA put off a decision to revise the 1991 NPDWR for chromium because health studies were "in process."

108.    It has now been more than 27 years since EPA set the current insufficient federal limit on chromium in drinking water, more than 16 years since EPA recognized in Six-Year Review 1 that revisions to that regulation "may be appropriate," more than 10 years since the NTP study was completed and the IRIS study began, more than eight years since EPA recognized in Six-Year Review 2 that there is "clear evidence of carcinogenic activity" in animals and "a statistically significant increase in stomach cancer" in humans and observed noncancer effects.

109.    In 2016, EPA's website still stated: "EPA is now reviewing data from a 2008 long-term animal study by the Department of Health and Human Service's National Toxicology Program, which suggested that chromium-6 may be a human carcinogen if ingested.  When the review is completed, EPA will consider this and other information to determine whether the

19

drinking water standard for total chromium needs to be revised."

110.    Not only have three full six-year review cycles been completed without a decision to revise the NPDWR for chromium, but more than one-third of EPA's fourth six-year review cycle has already elapsed.

111.    For its Six-Year Review 3, EPA set an "information cutoff date" of December 2015 and stated that any health effects assessments "completed after this cutoff date will be reviewed by EPA during the next review cycle…."  82 Fed. Reg. at 3522.

112.    As of the date of filing this complaint in 2019, EPA's website states: "EPA regularly re-evaluates drinking water standards and, based on new science on chromium-6, began a rigorous and comprehensive review of its health effects in 2008."

https://www.epa.gov/dwstandardsregulations/chromium-drinking-water

113.    The same EPA webpage states "For more information on the status of the IRIS assessment of hexavalent chromium, please visit: [link to the EPA IRIS webpage]."

114.    That linked EPA IRIS webpage states that IRIS health assessments include seven steps: (1) Draft Development; (2) Agency Review; (3) Interagency Science Consultation; (4) Public Comment and External Peer Review; (5) Revise Assessment; (6) Final Agency Review/Interagency Science Discussion; (7) Final Assessment.

https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?substance_nmbr=144

115.    As of the date of filing this complaint, the same EPA IRIS webpage states that the Chromium VI health assessment (which EPA added to its IRIS agenda in 2008) "is in step 1 at this time."

116.    In fact, EPA had released an external review draft, *i.e.*, Step 4, of its IRIS human health assessment for chromium-6 in 2010.  75 Fed. Reg. 60454 (Sept. 30, 2010).

117.    But EPA later reversed course and went back to Step 1 of the IRIS health assessment process.

118.    Beyond Step 1, the expected dates for further steps are listed on EPA's website as "TBD."  https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?substance_nmbr=144

119.    EPA has begun the Six-Year Review 4 process and states on its website that "Six-Year Review 4 results are anticipated to be completed in early 2023." https://www.epa.gov/dwsixyearreview/six-year-review-4-drinking-water-standards-information-collection-request

120.    If EPA uses a similar "information cutoff date" in Six-Year Review 4 as it did in Six-Year Review 3, then any health effects assessment not completed by December 2021 would not be reviewed in Six-Year Review 4 and might be deferred to Six-Year Review 5, which is due to be completed by 2029.

121.    Furthermore, based on EPA's track record for revising NPDWRs – *i.e.*, EPA took nearly ten years after its final decision to revise the Total Coliform Rule to actually revise it – absent Court intervention EPA's revision of the NPDWR may be delayed until 2039 or later.

122.    That would be almost 50 years after the chromium NPDWR was promulgated, more than 40 years after EPA revised its health risk assessment in 1998, and more than 35 years after EPA stated that revision of the chromium NPDWR "may be appropriate," all while millions of people consume highly toxic hexavalent chromium in their drinking water on a daily basis.

### **Regulatory Determinations**

123.    The Act requires EPA to make final regulatory determinations with respect to at least five contaminants listed on the Contaminant Candidate List not later than five years after the date the SDWA amendments of 1996 were enacted, which was August 6, 1996, (the

"Enactment Date") and every five years thereafter.

124.     Thus, the first final regulatory determination was due by August 6, 2001, the second was due by August 6, 2006, the third was due by August 6, 2011, and the fourth was due by August 6, 2016.

125.     EPA has missed each of these deadlines, by at least 23 months and as many as 52 months.

126.     EPA has made three regulatory determinations, which were published on July 18, 2003, July 30, 2008, and January 4, 2016, respectively.  68 Fed. Reg. 42898 (July 18, 2003); 73 Fed. Reg. 44251 (July 30, 2008); 81 Fed. Reg. 13 (Jan. 4, 2016).

127.     Not only did EPA fail to make regulatory determinations by the five-year deadlines measured from the Enactment Date, but none of the regulatory determinations were made within five years of each other.  For example, the third regulatory determination came more than 29 months after the fifth anniversary of the second regulatory determination.

128.     In its third regulatory determination, EPA stated that it is "delaying the final regulatory determination" for one contaminant (strontium).  81 Fed. Reg. at 13.

129.     EPA has not published its fourth regulatory determination, which was due no later than August 6, 2016.

### Contaminant Candidate Lists

130.     The Act requires EPA to publish a Contaminant Candidate List ("CCL"), *i.e.*, a list of contaminants that are not already subject to regulation but that are known or anticipated to occur in public water systems, not later than 18 months after the Enactment Date and every five years thereafter.

131.     Thus, the first CCL was due by February 6, 1998, the second CCL was due by

February 6, 2003, the third CCL was due by February 6, 2008, the fourth CCL was due by February 6, 2013, and the fifth was due by February 6, 2018.

132.    EPA has missed each of these deadlines.

133.    EPA missed the second, third, and fourth deadlines by more than 24, 20, and 45 months respectively.

134.    EPA has issued four CCLs, which were published on March 2, 1998, February 24, 2005, October 8, 2009, and November 17, 2016, respectively.  63 Fed. Reg. 10274 (Mar. 2, 1998); 70 Fed. Reg. 9071 (Feb. 24, 2005); 74 Fed. Reg. 51850 (Oct. 8, 2009); 81 Fed. Reg. 81099 (Nov. 17, 2016).

135.    Not only did EPA fail to publish the CCLs by the 18-month and five-year deadlines measured from the Enactment Date, but two of the three subsequent CCLs were issued more than five years after the previous CCL.  In particular, CCL 2 was issued more than 23 months after the fifth anniversary of CCL 1, and CCL 4 was issued more than 25 months after the fifth anniversary of CCL 3.

136.    EPA has not published a fifth Contaminant Candidate List, which was due by February 6, 2018.

137.    Nearly eight months after that deadline, on October 5, 2018, EPA requested nominations of chemicals, microbes, or other materials for possible inclusion on a draft fifth Contaminant Candidate List to be prepared at some point in the future.  83 Fed. Reg. 50364 (Oct. 5, 2018).

138.    EPA's pattern of non-compliance with the SDWA demonstrates that the agency lacks effective internal governance mechanisms to ensure that the mandatory statutory deadlines imposed by this important health and safety legislation are met.

# VI.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Failure to Perform Nondiscretionary Duties**
**Review and Revision of Existing National Primary Drinking Water Regulations**
**(42 U.S.C. §§ 300g-1(b)(9), 300j-8(a)(2))**

139.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

140.    Subsection 1412(b)(9) of the Safe Drinking Water Act provides that "The Administrator shall, not less often than every 6 years, review and revise, as appropriate, each national primary drinking water regulation promulgated under this subchapter."  42 U.S.C. § 300g-1(b)(9).

141.    Subsection 1412(b)(9) requires EPA to review each and every existing NPDWR in every six-year period.

142.    Subsection 1412(b)(9) requires EPA to revise the regulations that are appropriate for revision within that same six-year period.

143.    Subsection 1412(b)(9) also provides that "Any revision of a national primary drinking water regulation shall be promulgated in accordance with this section, except that each revision shall maintain, or provide for greater, protection of the health of persons."  42 U.S.C. § 300g-1(b)(9).

144.    The term "this section" in Subsection 1412(b)(9) means Section 1412 of the Act, 42 U.S.C. § 300g-1.

145.    Subsection 1412(b)(1)(E) requires that, with respect to the regulation of unregulated contaminants, EPA must propose an NPDWR not later than 24 months after the determination to regulate and must promulgate the NPDWR within 18 months after the proposal

thereof, subject to an extension of no more than 9 months for the promulgation.  42 U.S.C. § 300g-1(b)(1)(E).

146.    Subsection 1412(b)(1)(E)'s deadlines for the proposal and promulgation of NPDWRs for unregulated contaminants are applicable to the proposal and promulgation of revised NPDWRs through the requirement in Subsection 1412(b)(9) that any NPDWR revision shall be promulgated in accordance with Section 1412.

147.    Congress did not intend EPA to take a longer period of time to revise an existing NPDWR than the statute allows for EPA to promulgate an NPDWR for an unregulated contaminant.

148.    In Six-Year Review 2, the results of which were published on March 29, 2010, EPA determined that it is appropriate to revise the existing NPDWRs for tetrachloroethylene and trichloroethylene.

149.    EPA did not propose or promulgate a revised NPDWRs for tetrachloroethylene or trichloroethylene by the completion of Six-Year Review 2.

150.    EPA published the results of Six-Year Review 3 on January 11, 2017.

151.    EPA did not propose or promulgate a revised NPDWR for tetrachloroethylene or trichloroethylene by the completion of Six-Year Review 3.

152.    As of the date of filing this complaint, more than a third of the statutorily mandated six-year period for Six-Year Review 4 has elapsed.

153.    EPA has not yet proposed or promulgated a revised NPDWR for tetrachloroethylene or trichloroethylene.

154.    On information and belief, EPA is not presently on schedule to promulgate a revised NPDWR for tetrachloroethylene or trichloroethylene by the completion deadline for Six-

Year Review 4.

155.     On information and belief, EPA is not working on a revised NPDWR for tetrachloroethylene or trichloroethylene.

156.     In Six-Year Review 3, the results of which were published on January 11, 2017, EPA determined that it is appropriate to revise the existing NPDWRs for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses.

157.     EPA did not propose or promulgate a revised NPDWR for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, or viruses by the completion of Six-Year Review 3.

158.     EPA has not yet proposed or promulgated a revised NPDWR for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, or viruses.

159.     On information and belief, EPA is not presently on schedule to promulgate a revised NPDWR for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, or viruses by the completion deadline for Six-Year Review 4.

160.     On information and belief, EPA is not working on a revised NPDWR for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, or viruses.

161.     EPA did not propose revised NPDWRs for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses within 24 months of its determinations to revise those

NPDWRs.

162.    In failing to propose and promulgate revised NPDWRs for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses, EPA is in violation of Section 1412, Subsection 1412(b)(9), and Subsection 1412(b)(1)(E) of the Act, 42 U.S.C. §§ 300g-1, 300g-1(b)(9), 300g-1(b)(1)(E), and failed to perform nondiscretionary duties that the court has jurisdiction to enforce in this citizen's civil action under 42 U.S.C. § 300j-8(a)(2).

163.    These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

**SECOND CAUSE OF ACTION**

**Failure to Perform Nondiscretionary Duties**
**Review and Revision of Existing National Primary Drinking Water Regulations**
**(42 U.S.C. §§ 300g-1(b)(9), 300j-8(a)(2))**

164.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

165.    This cause of action is pleaded in the alternative as permitted by Fed. R. Civ. P 8(d)(2).

166.    Subsection 1412(b)(9) of the Safe Drinking Water Act provides that "The Administrator shall, not less often than every 6 years, review and revise, as appropriate, each national primary drinking water regulation promulgated under this subchapter."  42 U.S.C. § 300g-1(b)(9).

167.    Subsection 1412(b)(9) requires EPA to review each and every existing NPDWR in every six-year period.

168.    Subsection 1412(b)(9) requires EPA to make a determination within that same six-year period as to whether it is appropriate to revise each existing NPDWR.

169.     This determination is sometimes referred to as a "revise/not revise" decision.

170.     In Six-Year Review 2, EPA stated that tetrachloroethylene and trichloroethylene are "candidates for regulatory revision."  75 Fed. Reg. 15500 (Mar. 29, 2010).

171.     In Six-Year Review 3, EPA stated that chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses are "candidates for regulatory revision."  82 Fed. Reg. 3518, 3526 (Jan. 11, 2017).

172.     In the event that Defendants argue or the Court finds that EPA has not determined that it is appropriate to revise the existing NPDWRs for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and/or viruses, EPA has failed to perform the nondiscretionary duty to make a determination within each six-year period as to whether it is appropriate to revise those existing NPDWRs.

173.     In failing to determine whether it is appropriate to revise the existing NPDWRs for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses, EPA is in violation of Subsection 1412(b)(9) of the Act, 42 U.S.C. § 300g-1(b)(9), and failed to perform nondiscretionary duties that the court has jurisdiction to enforce in this citizen's civil action under 42 U.S.C. § 300j-8(a)(2).

174.     These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

## THIRD CAUSE OF ACTION

**Failure to Perform Nondiscretionary Duties**
**Review and Revision of Existing National Primary Drinking Water Regulations**
**(42 U.S.C. §§ 300g-1(b)(9), 300j-8(a)(2))**

175.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

176.    Subsection 1412(b)(9) of the Safe Drinking Water Act provides that "The Administrator shall, not less often than every 6 years, review and revise, as appropriate, each national primary drinking water regulation promulgated under this subchapter."  42 U.S.C. § 300g-1(b)(9).

177.    The existing NPDWR for chromium was promulgated by EPA in 1991 and has not been revised since.

178.    EPA reviewed the existing NPDWR for chromium in its Six-Year Review 1.  67 Fed. Reg. at 19030.

179.    Based on that review, EPA stated in 2002 that it "may be appropriate" to revise the existing NPDWR for chromium in light of "changes in the health risk assessment," but "the Agency believes that a decision to revise the chromium NPDWR at this time is premature."  67 Fed. Reg. at 19057, 19060.

180.    EPA reviewed the existing NPDWR for chromium in its Six-Year Review 2.  75 Fed. Reg. at 15530.

181.    Based on that review, although EPA stated in 2010 that the National Toxicology Program study "found clear evidence of carcinogenic activity" and "observed noncancer effects," the agency stated that the existing NPDWR for chromium was "not appropriate for revision at this time" because an IRIS health assessment was "in process."  75 Fed. Reg. at 15530.

182.    EPA did not review the existing NPDWR for chromium, or did not complete its

review of the existing chromium NPDWR, in its Six-Year Review 3.

183.    Instead, EPA merely deferred its review of the existing chromium NPDWR and deferred the decision of whether to revise that NPDWR to Six-Year Review 4.

184.    In failing to review the existing NPDWR for chromium in Six-Year Review 3 and in deferring the decision whether to revise the NPDWR, EPA failed to perform nondiscretionary duties that the court has jurisdiction to enforce in this citizen's civil action under 42 U.S.C. § 300j-8(a)(2).

185.    These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

## FOURTH CAUSE OF ACTION

### Judicial Review of Agency Action
### (5 U.S.C. § 706(2))

186.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

187.    This cause of action is pleaded in the alternative or partial alternative as permitted by Fed. R. Civ. P 8(d)(2).

188.    The Administrative Procedure Act ("APA") authorizes the court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

189.    To the extent that EPA may argue or the Court may find that EPA reviewed and/or completed its review of the 1991 NPDWR for chromium in Six-Year Review 3, such review was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, *inter alia*, it was cursory, perfunctory, devoid of analysis, and contrary to Congress's intent that EPA review the existing NPDWRs in each six-year period in a manner sufficient to support a "revise/no revise" determination as final agency action, as well as contrary to

Congress's intent that the existing NPDWRs be revised in a timely fashion to maintain or provide for greater protection of the health of persons.

190.    To the extent that EPA may argue or the Court may find that EPA made a revise/not revise decision with respect to the 1991 NPDWR for chromium in Six-Year Review 3, such determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, *inter alia*, in was not based upon a complete and adequate review of the 1991 NPDWR for chromium, and the decision to again defer a decision to revise the NPDWR was contrary to Congress's intent that the existing NPDWRs be revised in a timely fashion to maintain or provide for greater protection of the health of persons.

191.    These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

### FIFTH CAUSE OF ACTION

**Failure to Perform Nondiscretionary Duties**
**Determinations to Regulate Previously Unregulated Contaminants**
**(42 U.S.C. §§300g-1(b)(1)(B)(ii)(I), 300j-8(a)(2))**

192.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

193.    Subsection 1412(b)(1)(B)(ii)(I) of the Safe Drinking Water Act provides that "Not later than 5 years after August 6, 1996, and every 5 years thereafter, the Administrator shall, after notice of the preliminary determination and opportunity for public comment, for not fewer than 5 contaminants included on the list published under clause (i), make determinations of whether or not to regulate such contaminants."  42 U.S.C. § 300g-1(b)(1)(B)(ii)(I).

194.    The phrase "list published under clause (i)" in Subsection 1412(b)(1)(B)(ii)(I) means the Contaminant Candidate List, abbreviated as "CCL."

195.    EPA has a statutory obligation to make final regulatory determinations with

respect to at least five contaminants published on the CCL not later than five years after August 6, 1996, which was the date of enactment of the SDWA amendments of 1996, *i.e.*, the Enactment Date, "and every 5 years thereafter." 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I).

196. Thus, the first final regulatory determination was due by August 6, 2001, the second was due by August 6, 2006, the third was due by August 6, 2011, and the fourth was due by August 6, 2016.

197. EPA published its first regulatory determination on July 18, 2003, more than 23 months late. 68 Fed. Reg. 42898.

198. EPA published its second regulatory determination on July 30, 2008, more than 23 months late. 73 Fed. Reg. 44251.

199. EPA published its third regulatory determination on January 4, 2016, more than 52 months late. 81 Fed. Reg. 13.

200. EPA has not published its fourth regulatory determination, which was due no later than August 6, 2016.

201. EPA has failed to determine, by August 6, 2016, whether or not to regulate five or more contaminants published on the CCL, as required by Subsection 1412(b)(1)(B)(ii)(I) of the Act, 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I).

202. In failing to make the fourth regulatory determination required by Subsection 1412(b)(1)(B)(ii)(I) of the Act, 42 U.S.C. § 300g-1(b)(1)(B)(ii)(I), EPA failed to perform one or more nondiscretionary duties that the court has jurisdiction to enforce in this citizen's civil action under 42 U.S.C. § 300j-8(a)(2).

203. These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

## SIXTH CAUSE OF ACTION

**Failure to Perform Nondiscretionary Duties**
**Publication of Contaminant Candidate List**
**(42 U.S.C. §§300g-1(b)(1)(B)(i)(I), 300j-8(a)(2))**

204.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

205.    Subsection 1412(b)(1)(B)(i)(I) of the Safe Drinking Water Act provides that "Not later than 18 months after August 6, 1996, and every 5 years thereafter, the Administrator, after consultation with the scientific community, including the Science Advisory Board, after notice and opportunity for public comment, and after considering the occurrence data base established under section 300j-4(g) of this title, shall publish a list of contaminants which, at the time of publication, are not subject to any proposed or promulgated national primary drinking water regulation, which are known or anticipated to occur in public water systems, and which may require regulation under this subchapter."  42 U.S.C. § 300g-1(b)(1)(B)(i)(I).

206.    The list referred to in Subsection 1412(b)(1)(B)(i)(I) is the Contaminant Candidate List, abbreviated as "CCL."

207.    EPA has a statutory obligation to publish a Contaminant Candidate List not later than 18 months after August 6, 1996, *i.e.*, the Enactment Date, "and every 5 years thereafter."  42 U.S.C. § 300g-1(b)(1)(B)(i)(I).

208.    Thus, the first CCL was due by February 6, 1998; the second CCL was due by February 6, 2003; the third CCL was due by February 6, 2008; the fourth CCL was due by February 6, 2013; and the fifth was due by February 6, 2018.

209.    EPA published CCL 1 on March 2, 1998.  63 Fed. Reg. 10274.

210.    EPA published CCL 2 on February 24, 2005, more than 24 months late.  70 Fed. Reg. 9071.

211.     EPA published CCL 3 on October 8, 2009, more than 20 months late.  74 Fed. Reg. 51580.

212.     EPA published CCL 4 on November 17, 2016, more than 45 months late.  81 Fed. Reg. 81099.

213.     EPA has not published a fifth Contaminant Candidate List.

214.     EPA has thus failed to publish, by February 6, 2018, a fifth list of contaminants that are not subject to any proposed or promulgated NPDWR but are known or anticipated to occur in public water systems and may require regulation under the Act, as required by Subsection 1412(b)(1)(B)(i)(I) of the Act, 42 U.S.C. § 300g-1(b)(1)(B)(i)(I).

215.     In failing to publish the fifth CCL as required by Subsection 1412(b)(1)(B)(i)(I), 42 U.S.C. § 300g-1(b)(9), EPA failed to perform one or more nondiscretionary duties that the court has jurisdiction to enforce in this citizen's civil action under 42 U.S.C. § 300j-8(a)(2).

216.     These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

## SEVENTH CAUSE OF ACTION

### Declaratory Judgment
### (28 U.S.C. §§ 2201, 2202)

217.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

218.     The Declaratory Judgments Act provides that in a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C. § 2201.

219.     The Declaratory Judgments Act also provides that "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  28

34

U.S.C. § 2202.

220.    Plaintiffs seek a declaratory judgment with respect to the deadlines by which EPA

must take certain actions required by the Safe Drinking Water Act.

221.    Specifically, Plaintiffs seek judicial declarations that:

(a)    EPA is required by Subsection 1412(b)(9) of the Act to review each and

every existing NPDWR "not less often than every 6 years."

(b)    EPA is required by Subsection 1412(b)(9) of the Act to make a revise/not

revise decision with respect to each existing NPDWR "not less often than every 6 years."

(c)    EPA is required by Subsection 1412(b)(9) of the Act to revise each

NPDWR that is appropriate for revision within the same six-year period that EPA

determines that the NPDWR should be revised.

(d)    The deadlines for proposal and promulgation set forth in Subsection

1412(b)(1)(E) of the Act apply to the proposal and promulgation of revised NPDWRs.

(e)    Congress did not intend EPA to take a longer period of time to revise an

existing NPDWR than the statute allows for EPA to promulgate an NPDWR for an

unregulated contaminant.

(f)    In using the statutory phrase "and every 5 years thereafter" in 42 U.S.C.

§§ 300g-1(b)(1)(B)(i)(I), 300g-1(b)(1)(B)(ii)(I), and 300j-4(a)(2)(B)(i), Congress

established a series of precise mandatory deadlines for EPA's completion of the

Contaminant Candidate Lists, regulatory determinations, and Unregulated Contaminant

Monitoring Rules that are measured from the Enactment Date of August, 6, 1996, and

cannot be amended absent a subsequent act of Congress.

(g)    EPA's failure to meet a statutory deadline imposed by 42 U.S.C. §§ 300g-

1(b)(1)(B)(i)(I), 300g-1(b)(1)(B)(ii)(I), or 300j-4(a)(2)(B)(i) does not extend the deadline

for EPA to take any future action required by those subsections.

222.    Plaintiffs also seek judicial declarations with respect to related rights,

responsibilities, and legal issues that may arise during the litigation of the aforementioned issues.

223.    There are actual and justiciable controversies between Plaintiffs and Defendants

regarding Defendants' mandatory obligations and deadlines under the Act and the actions EPA is

required to take in order to meet these statutory obligations and deadlines.

224.    These actual and justiciable controversies are likely to continue and recur because

EPA has ongoing and recurring statutory obligations – repeating every five or six years – to

complete the above actions.

225.    A judicial declaration of the parties' respective rights and obligations with respect

to Defendants' statutory obligations under the Act is necessary and appropriate because of the

ongoing and recurring nature of EPA's obligations under the Act.

226.    These violations have harmed and continue to harm Plaintiffs and their members.

Plaintiffs have no adequate remedy at law for these violations.

### EIGHTH CAUSE OF ACTION

**Unreasonable Delay**
**(5 U.S.C. §§ 551(13), 706(1))**

227.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

228.    This cause of action is pleaded in the alternative as permitted by Fed. R. Civ. P

8(d)(2).

229.    The Administrative Procedure Act authorizes the court to "compel agency action

unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

230.    EPA has unlawfully withheld and unreasonably delayed proposing and

promulgating revised NPDWRs for tetrachloroethylene and trichloroethylene, which regulations EPA determined were appropriate for revision in 2010.

231.    EPA has unlawfully withheld and unreasonably delayed proposing revised NPDWRs for chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses, which regulations EPA determined were appropriate for revision in 2017.

232.    In the event that EPA argues or the Court finds that EPA's determination that the regulations for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses are "candidates for regulatory revision" was not a determination that that those regulations are appropriate for revision, EPA has unlawfully withheld and unreasonably delayed making revise/no revise determinations for those existing NPDWRs.

233.    EPA has unlawfully withheld and unreasonably delayed review of the NPDWR for chromium.

234.    EPA has unlawfully withheld and unreasonably delayed a revise/no revise determination for the NPDWR for chromium.

235.    EPA has unlawfully withheld and unreasonably delayed completion of the health assessment of chromium, particularly hexavalent chromium.

236.    EPA has unlawfully withheld and unreasonably delayed the fourth regulatory determination.

237.    EPA has unlawfully withheld and unreasonably delayed issuing the fifth CCL.

238.    These delays are unreasonable because, *inter alia*: (1) Congress provided timetables and clear expressions of the speed with which it expects EPA to proceed; (2) EPA has

chronically failed to act in a timely manner, is often years late in completing required actions, and is continuing to delay action; (3) there is no valid reason for EPA's repeated and extensive failures to timely comply with legislative mandates; and (4) EPA's delays adversely affect public drinking water supplies and human health, safety, and welfare.

239.    These violations have harmed and continue to harm Plaintiffs and their members. Plaintiffs have no adequate remedy at law for these violations.

## VII.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court issue an order and judgment providing the following relief:

a.    Declaring that Defendants have unlawfully failed to revise the National Primary Drinking Water Regulations for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses;

b.    Declaring that Defendants have unlawfully failed to make revise/no revise determinations for the National Primary Drinking Water Regulations for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses;

c.    Declaring that Defendants have unlawfully failed to review and revise the National Primary Drinking Water Regulation for chromium.

d.    Declaring that EPA's decision, if any, that the National Primary Drinking Water Regulation for chromium is not appropriate for revision "at this time" is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

e.  Declaring that Defendants have unlawfully failed to complete the fourth regulatory determination;

f.  Declaring that Defendants have unlawfully failed to issue the fifth Candidate Contaminant List;

g.  Making the judicial declarations set forth in Paragraph 221;

h.  Declaring that Defendants have committed unreasonable delays in carrying out their statutorily mandated duties under the Safe Drinking Water Act;

i.  Ordering Defendants to revise the National Primary Drinking Water Regulations for tetrachloroethylene, trichloroethylene, chlorite, cryptosporidium, haloacetic acids, heterotrophic bacteria, giardia lamblia, legionella, total trihalomethanes, and viruses within deadlines established by the Court;

j.  Ordering Defendants to review and revise the National Primary Drinking Water Regulation for chromium within deadlines established by the Court;

k.  Ordering Defendants to complete the fourth regulatory determination by a deadline established by the Court;

l.  Ordering Defendants to issue the fifth Candidate Contaminant List by a deadline established by the Court;

m.  Awarding Plaintiffs their litigation expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 300j-8(d); and

n.  Awarding any such other and further relief as this Court may deem just, proper, or appropriate.

Dated this 30th day of January, 2019
New York, New York

Respectfully submitted,

*/s/ Reed W. Super*
Reed W. Super
Michael DiGiulio

SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038
T: (212) 242-2355
F: (855) 242-7956
reed@superlawgroup.com
mike@superlawgroup.com

*Attorneys for Plaintiffs*